Good morning, Your Honor. Ellen Catts on behalf of the William E. Morris Institute for Justice, and with me is Jane Perkins from the National Health Law Program. I would request five minutes reserved for rebuttal. Just keep track of the time. It's counting down. There are two questions on appeal. The first one is whether the State's imposition and the Secretary's retroactive approval of the mandatory and heightened copayments violated the law, and whether the State's notices met the constitutional and statutory requirements. There are two groups in this case, the Medical Expense Deduction Program and the Proposition 204, which is the Voter Initiative for the Childless Adults. The State has submitted, the Secretary submitted a notice to the Court that the State intends to terminate the Medical Expense Deduction Program. Of our four arguments, only one pertains to that group, and so we will proceed with our arguments. Sotomayor, does that letter, at least with respect to your claim regarding the med group, does that affect mootness? Does it make it moot? Does it make your argument moot? Currently, it's not moot. The program is terminated as of October 1st, but currently it's not, and so if the Court were to rule before then, the persons who were in the program would get the relief. But if there's a decision after October 1st, then there's moot. It's moot. How does your claim have standing? Pardon? How do you have standing if the program is terminated? It doesn't take, if it doesn't take effect now, how do you have standing to sue? Because currently, well, since we filed the lawsuit and up until the present, there is a Medical Expense Deduction Program. It's ongoing. It's not going to be terminated until October 1st. Nobody's been harmed yet. Well, they have. They, I think. They're harmed, but not harmed. Well, vis-à-vis the copayments, everyone who will participate in the Medical Expense Deduction Program through October 1st will be charged the heightened and mandatory copayments. That was not affected by the decision to terminate the program. Right. The higher copayments are in play right now after the district court granted summary judgment. And they'll continue in play until October 1st. I'll just briefly touch on that argument because, obviously, we have three other arguments. But our argument on the Medical Expense Deduction Program is that these are persons who are described in the Medicaid Act, and as such, they should not lose the protections of the Medicaid Act. And specifically they're described. Right. Because if they're described in the Medicaid Act, they aren't an expansion population, and that's the point. Portland Adventist and Spry both defined expansion populations narrowly as those who can only be added to a State program via a demonstration waiver. They are not someone who could be added through a State plan. And so, given that, these persons are not expansion. They're described in the Medicaid Act. I've got to keep clear now. You're talking about the Med program? Just the Med program. You're only talking about Med right now. Keep it, because I think your argument changes a little bit with respect to the 204 population. Yes, it does. And so, and why we think this is important, because if the Secretary is allowed to put someone who is described in the Medicaid Act, and again, Medical Expense Deduction folks are some of those people are medically needy, just their incomes are too high. If the Secretary is allowed to approve moving persons who are described in the Medicaid Act into a demonstration waiver and then waiving all the provisions of the Medicaid Act, that could affect almost 30 percent of the populations. But we do have other arguments, and I want to briefly touch on them. Portland Adventist, we think under the holding of Portland Adventist, the Secretary does not have the authority to have what basically is a freestanding authority under Section 1115, which is the demonstration waiver provision. In Portland Adventist, the Secretary argued that there were two types of medical assistance, Title 19 and 1115, and that was rejected by the court in Portland Adventist. And so under that principle, the Secretary cannot set up what amounts to a separate funding source. The next argument is our Administrative Procedures Act argument under the Bino v. Shalala case. And it's clear from this record that the Secretary failed to review the request from the State in a legally sufficient manner. Under Bino v. Shalala, the Secretary's review has to be more than, oh, you've requested it, we'll approve it. And basically, that is what happened in this case. First of all, to have a Section 1115 waiver, there's got to be a research. If you prevail in that argument, what does that get you? If the Secretary did not review the request appropriately, the case should be reversed, whether it's remanded back to the Secretary or not would be a decision for this Court. But certainly, if there isn't an appropriate review, then it should be reversed. And we would say in a – When you say reversed, what is that? The district court judgment is reversed? And then what is the – what relief do you get? That's what I'm trying to ask. We would ask that there be an injunction in place for the copayments and for the notice. Up until the end of the program, which would be October 1. Well, no. Because the proposition – I'm only talking about – why don't you keep it straight, because I get confused. I'm talking about Med. Okay. Yes. For the MED, that is all we would get. We would get an injunction until October 1. All right. And I apologize if I sort of blended the two. Don't blend them together, because it's – Right. For the Proposition 204, the injunction would be long term. There wouldn't be a stop to the injunction, because that program continues. So under a Section 1115 waiver – and this argument applies to both groups – there's got to be something of research or demonstration value. And there's none in this case. The whole idea of a demonstration project is not to save the State money. But yet, in fact, that was the only reason given in this case. And we don't think that that's supported by the record, because, first of all, when the State submitted their request for the waiver, they made some claims that the legislature wanted them to do this in a way to save money. But yet, they never came forward with any data or analysis that said, well, this is how much we'll save, or this is what the expected savings were. Secondly, the evidence in the record doesn't even support that there would be a cost savings. ACCESS's own report questioned whether co-payments would save money, and ACCESS's own consultants concluded that the co-payments would reduce the use of preventative services and increase the use of hospitals. And finally, we have the ACCESS's own director questioning the whole notion of cost saving within the confines of a managed health care program, which is what Arizona's is. And then thirdly, when this demonstration project was renewed in 2006, it's in the administrative record, the governor said, we don't have a budget problem and the program is fully funded. We expect adequate funding. So there wasn't even that issue in the end. That wasn't even factually supported in 2006. So under B&O, we don't think cost saving is a proper reason to have a Section 11 demonstration waiver, and the record doesn't support it. But more importantly, in this case, what happened is when we filed, we thought that the State had requested and the Federal Government had approved the waiver. In fact, they hadn't. And so we filed, the administrative rule goes into effect in October. We filed the lawsuit in December, and then we submit in January our motion for preliminary injunction and motion for class certification. And at that point, we submit declarations from many persons who say how the co-payments will harm them, that they haven't been able to buy their medicines and as a result, they got sick and they had to go into the emergency room or use the hospital. About a month later, the Secretary retroactively approves the co-payments and never addresses the evidence that we've submitted. And in 2006, when the Secretary approves the co-payments again, by that time, we had already submitted the evidence from Dr. Leighton Koo, who was a national expert on co-payments, who said co-payments aren't novel. They are the most tested aspect of cost sharing. And not only are they not novel or experimental, but what the research shows is that they're a barrier to health care, which is in fact what our declarations showed as well. In my remaining time, I would like to just talk about the State's notices. Oh, I do want to mention one argument, because the Secretary has said in this case that the demonstration project at issue should not be the co-payments, but it should be the whole demonstration project. And in Arizona, our demonstration project goes back to 1982. And if accepted, what it means is that once the Secretary approves a demonstration project, the changes, even something as significant as co-payments, are not subject to scrutiny or accountability, and certainly it's very hard to get court review of them. Again, that, we think, violates the narrow, the holding in Beno that the Court should narrowly interpret demonstration waivers. And because of the history of co-payments in the Medicaid Act, where the legislature has said we want to be careful in how these are used, there's a very stringent process in how they're approved. That, that just, that's, this concept of that the Secretary could approve co-payments and there be almost no review of it flies in the face of that history. And we've also raised the issue that the co-payments violated the human experimentation provisions. I do want to just talk briefly about the defective notices that ACCESS, which is a State program, issued. There are three reasons that the State was required to issue adequate notices. The first is just the constitutional due process requirements of the Fourteenth Amendment under Goldberg v. Roberts. Roberts. There was one argument. Those notices have been superseded. No, there's nothing in the record that says those notices have been superseded. So those notices were issued when, when the co-payments went into effect. Right. Correct? And then the district court granted a preliminary injunction. Right. And we, and ordered the State to give a new notice. Forget what the State sent you. They no longer apply. I don't know that the injunction went to the notices, but I, I can't say for sure. Didn't, didn't they have to give, how did people know that the, that the, that the restrictions weren't going to apply? Oh, you mean, they certainly notified everyone and posted a notice that they were no longer charging the heightened co-payments or mandatory co-payments. But the issue initially is when they sent notices out to people, there was no way to tell in those notices whether, what group was being charged the co-payments. Right. Right. Okay. And, and that issue has, has not gone away. So, but, so my only point is that a number of years have passed, correct, since those notices were sent out? A number of years, as a matter of fact. That's right. But the State was. Okay. So then there was the preliminary injunction which reinstated, which put things in place for about four years, correct? Oh, the, the injunction was in place for more than six years, Your Honor. Well, six years. Okay. And then the district court granted summary judgment. Right. Right. And allowed them to implement the heightened co-payments. That's right. Correct? And so I presume they gave a new notice?  It's not in the administrative records. But the, the point is the State has continued to argue that those inadequate notices that they gave were adequate, and so they could choose to use that kind of notice again in the future unless they are told by the State. Is that somewhat speculative? I don't think it's speculative, because. Well, well, that, well, if the new notice they had sent out was of questionable. That notice is not before the court. I mean, I assume that if it would, I would think that you would say, well, look, they can't be trusted, because despite our arguments, they gave the same notice six years, six or seven years later. Well, we did not think the new notice was sufficient, Your Honor. If that's what you're asking us, no, we didn't think it was sufficient. But it's not in the record, and so I was uncomfortable arguing about that. What we have is we have an obviously a deficient notice. I never told people what group they were in and why they were being charged the notice. The only one that even came close to it was the Don House, which said, why are my copayments being raised? And the notice said, because you're in a mandatory group, whatever that is. And we have evidence in the file of the Gallagher Declaration that said some people got the notices improperly, people didn't understand the notices. This is an important issue, because hearing notices of agency action are fundamental to the proper administration of the program. Let me ask you one question that occurred to me as I was reading your brief, or looking at your brief, reviewing your brief. With respect to the proposition 204 population? Yes. I seem to have the impression that you were not vigorously pursuing your argument as to that population. Oh, on the contrary, Your Honor. I mean, that is, in fact, our biggest group, is the Proposition 204. The issue of are you described in the Medicaid Act, at least prior to March of 2010, only applied to the medical expense deduction group. Everything else applied to the Proposition 204, and we feel very strongly on those arguments. That's why I sort of shifted into those arguments. I mean, this, be it the administrative record argument, the freestanding authority, and the notices, all apply, as well as the human experimentation. Now, it's just that the one issue pertaining to the medical expense deduction was a separate issue that does not apply to the Prop 204, folks. But if we gave you the impression that we did not feel very strongly about that group, that numbers about 250,000 low-income persons in Arizona, that was our failure. Okay. Do you want to save the rest of your time, Ms. Buttle? I do. Thank you, Your Honor. Good morning. I'm Stephanie Marcus from the Department of Justice, and I represent Appley Kathleen Sebelius, Secretary of Health and Human Services. I am dividing my time this morning with Mr. Logan Johnston, who's counsel for Appley Thomas Betlack, and so I'm going to reserve five minutes of my time for him.          Thank you, Ms. Buttle. Thank you, Ms. Buttle. Thank you, Ms. Buttle. Your Honor, the – there are three separate arguments, and just first to briefly address the argument that counsel acknowledged does not apply to the childless adult population, as she refers to it as the Prop 204 population. That – the MED program is, indeed, terminating on October 1st, and will – so that first argument will become moot then, but as of now, that – the district court was correct in rejecting that argument because no one in the MED population is medically needy, as described in the Medicaid statute. The term – none of the plaintiffs in this case, in either class, are statutorily eligible for Medicaid or included within the state Medicaid plan. And medically needy means for purposes of the Medicaid Act, you have to be included in the state plan. If a state's going to participate in Medicaid, it has a choice of including medically needy in its plan. Arizona has chosen not to, and therefore, there is no medically needy population. And that the – Well, they're part of the – well, they don't want to be referred – they're part of the expansion. Yes, exactly. Just like the plaintiffs in Spry, they are not eligible for Medicaid. They are part of an expansion population. And so the holding of Spry is fully applicable to all the plaintiffs here, and the – this Court's distinction of Portland Adventist, which involved disproportionate hospital reimbursements under Medicare, is fully applicable to all class members here. But it's also important and informs the APA claim that Federal statutory requirements on cost sharing are just not applicable here. The Secretary, when reviewing Arizona's request to impose the copayments as part – which extends to the two expansion populations, was looking at a very distinct situation from what this Court was looking at in Beano, where you had categorically eligible AFDC recipients. And there, the demo was nothing but a benefits cut, and this Court expressly noted that a waiver of Federal statutory requirements was required. Here, no waiver is required. And that's what the Secretary clearly stated. So why do they have to get a waiver from the Secretary? Well, the Secretary – Why does the Secretary even have a role here, then? Well, it's still – the Secretary still, if you are changing, you know, the terms of your expansion or demonstration, the Secretary still has a role in approving those. And just as a – But shouldn't – if the Secretary has a role, shouldn't she – isn't she required to apply the statutory standard? Yes. And, Your Honor – Whether this is a true demonstration program and not just a cost-saving measure for the State? Your Honor, she did indeed apply the statutory standard, which is to ensure that the demonstration remains consistent with the objectives of the Medicaid program. And here, as the Secretary stated in approving the copayments and the – and the change, that she determined that the approved demonstration project will continue to serve the purposes of Title 19 because the demonstration project will continue to ensure wider health benefit coverage for low-income populations. And when – this was a means for Arizona to continue its expansion, an expansion that it did not need to make under federal requirements. And when it had a budgetary shortfall, it – this was a way of addressing that. And it's in the context of expanding coverage to low-income populations that would otherwise be uninsured. And therefore, the context of the record and the Secretary's approval is very important. And in fact, we believe the fact that now, you know, facing severe budget crisis, Arizona has chosen to terminate the MED program as of October 1st shows that this – you know, here, there is – these are not populations that are required to be covered if the State's going to participate in Medicaid. And the Secretary's determination in that context that these slightly increased copayments that, you know, I should point out, are also not applicable to everyone in, you know, the MED or to all of the plaintiffs. There are plenty of exclusions for – as we point out, it's in footnote five of our brief and also in the statutory addendum that the plaintiffs have attached. If you look at the Arizona rule, there's a whole list of individuals who are excluded from copayments. The record also shows the process that the Secretary goes through in examining the demonstration project. There's a lot of give and take between the Secretary and the State and correspondence and outlining of options. And here, because the State does not have to – the federal statutory cost sharing requirements don't apply, it is that the State here itself had a lot of process leading up to imposing the copayments. The State notes that it held hearings, it met with constituent groups, made the Secretary aware of this. And the only submission by plaintiffs in the administrative record is a letter that plaintiffs wrote in November of 2003. And that State simply seeks – if you review that letter, which is on page 216 of the record excerpts, it essentially outlines the legal argument that the plaintiffs have about the cost sharing restrictions of copayments. And so the Secretary has clearly in the record outlined her position to Arizona that for expansion populations, there does not need to be a waiver of any federal statutory requirements. So both – and as for the Section 3515B argument, we think that inquiry is subsumed into the Section 1315 inquiry about whether the demonstration project taken as a whole with the copayments is consistent with Medicaid statute objectives, where as here, a State's demonstration is extending coverage to people who would otherwise be uninsured, how could that present a danger to the plaintiffs? And that by making the determination that the demo was consistent with Medicaid objectives, the Secretary essentially did consider that it clearly concluded that it would not be a waiver of any federal statutory requirements. And if this Court does not have any questions, I will reserve the rest of my time for Mr. Johnston. Thank you. Johnston. Good morning, Your Honors. Logan Johnston for Thomas Bettelheim. First, I will join in the argument made by counsel for Secretary Sebelius. And secondly, I just wanted to address the notice issue. And if I can, I'll start with the questions that were asked from the Court this morning about that issue. I, too, consider this issue moot. By the standards set in the plaintiff's own reply brief, the intervening events since 2003 have eradicated the effects of the alleged violation, and the plaintiffs no longer need protection of the Court on this issue. And the reason is very simply, as Ms. Katz stated in her argument, new notices have gone out once the injunction ended in October of 2010. And if, as Ms. Katz says this morning, those notices are not sufficient, this is the first I've heard of that. There has been no allegation below that those notices were not compliant with whatever standard she chooses to apply. Well, the district court didn't have discretion. They would have had to commence a new lawsuit just over the notices. Well, I think she could have objected to the notices as they were. Well, they could have objected. They could have written you a nasty letter and said, you know, we object to these notices because they're inadequate for the following reasons. I think she could have done more than that, Your Honor. But that you'd say, so what? You know, take us to court. No, I think she would have had a receptive audience in Judge Carroll, who entered the injunction in 2003 in no small part because he thought there wasn't. But there's no jury. He entered a final judgment, correct? Well, that's true. So he entered a final judgment. The case is now up on appeal with us. He doesn't have any jurisdiction. Correct. She would have had to start a whole new lawsuit. She would have had to file a new lawsuit over these recent notices. And I think the logic of the situation from our point of view, Your Honor, is that she would have done that. Well, these notices that you gave, you know, that are at least the subject of her law of the original lawsuit leave much to be desired. I mean, I couldn't make, you know, if I were the recipient of one of those, I wouldn't know whether I why my benefits were being why the copayments were being increased. Your Honor, we can certainly argue about how good they were and how they could have been improved. But I think the basic point that we would make is that they did comply with due process, which is the standard that applied here, not the Medicaid statutes. Under due process, which was required because of our agreement with the Centers for Medicaid and Medicare Services, the Federal Government, in our operational protocol, which funds this program, we agreed with them that we would send out notice and allow people a hearing. It was a voluntary act as part of that agreement rather than pursuant to the Medicaid statutes. And so the standard that we had to meet, I think, is the basic one of telling people what's happening, what they can do about it if they object, do they have a right of appeal, what the legal authority is. And these notices may not be artful. They may not be the best we've ever sent out. I don't attempt to defend them as the best thing we've ever done, Judge. But they meet those basic standards. And that ---- Somewhat questionable whether they really ---- it says some members, some members under the ---- will have their copayments increased. And then it says the date your act ---- because the date your act's copayments amounts will increase on effective such and such a date. That's basically all it says. I'm sorry? It's basically it. And it tells them what's happening. It doesn't tell me why. It says the Arizona legislature has authorized access to require mandatory copayments. It says some. For some ex-members. Some ex-members. Under the authority of the particular ---- So not everybody is in ---- not everybody. Correct. Subject to mandatory copayments, correct? That's correct. And it doesn't say why I happen to fall within that group or why this recipient of this notice falls within the group of mandatory copayments. That's correct, Judge. It does not parse all the eligibility groups. No question about it. But in any event, we do know that we do know just from this record that the district court judge ordered ---- he enjoined implementation of those copayments. He did. And he ordered a new notice to be given. Once the ---- I don't believe his order went that far, Judge. What I think he did was to say we had to send out notice to all providers that they could not ---- But not necessarily to the participants. Well, that was part and parcel of the notice we had to give as a result of the injunction, but I don't think it was specifically an order. Now, how about when he reinstated ---- when he granted summary judgment? When he granted ---- And allowed for the State and allowed the State to implement the copayments. I don't believe there was anything in his order that addressed ---- But I would assume that the State took advantage of that, correct? When the summary judgment was granted and the injunction was vacated, yes. We sent out notices, as Ms. Katz has stated, that the copayments were going into effect in October of 2010. And I gather you've sent out notices with respect to the med population that's affected by the termination of the program. That's correct, Judge. And the same process is in effect ---- this is outside the record, but just for your information, the same process is in effect for the other portion of the Proposition 204. So the State has taken steps to also terminate that program as well? Yes, Judge. We have to get Federal permission. And that was applied for about a month after the request was made for the med population. Is that strictly because of budgetary considerations? There's simply no money in Arizona for these optional populations anymore, Judge. That's correct. And just to make one point that I think you should ---- But you said a cure. How do those people get medical care, then? They will get care through voluntary provision of care by providers on occasion, by charitable institutions. It's going to be difficult. But I think the ---- So once the State implements its cutback on the med, that goes into effect, and then let's say sometime next year the 204 population is removed. So then what the program that Arizona has left is just the basic Medicare program that it must comply with? The categorically needy individuals identified under Medicare. Correct. What's happening in Arizona, Your Honor, is that the optional services, the optional populations are being cut to preserve the core Medicaid population, the categorically eligible. Access Arizona has never covered the medically needy population, only the categoricals in these expansion populations. And by covering the expansion populations, I hope it's clear, what Arizona was doing was giving coverage to people who aren't disabled, who aren't blind, who don't have children. And at one point they were doing it all under their own state funds, correct? They were doing it for a limited group with their own funds, correct. Right. And then they applied to, they folded their program into this expansion. They did that to get federal funding in addition to their own funds and thereby expand the program. And that was done at a time when the voters seemed to think we could do all things, and subsequent events have proven that's just not possible. How does the State, I'm just, maybe I'm just curious, but how does the, I thought the 204 population, the way in which the initiative was passed, required that you cover them. It requires, and this is a little bit complicated, Judge, but it requires that State funds from the general fund be used to supplement a fund from the cigarette litigation in the 1990s. If that's insufficient, then if there are available funds to supplement, we are required to supplement with those available funds. The issue in State litigation that will undoubtedly be filed if the federal government gives us a waiver to withdraw from this Proposition 204 population in October, there will be litigation filed over whether or not we do, under that initiative, have to continue covering these people with or without money. I see. Okay. Thank you, Your Honor. Thank you for the information. I was just trying to understand all of the operational parts. I just want to address a few of the comments that were made. SPRY is very definitive as to what an expansion population is. It's defined as childless adults. That's the end of the inquiry. It did not go into any other category. It talked about categories described in the Medicaid Act, and then it said expansion population was the childless adults. I think, didn't Adventist Health Care sort of pull back from that? Pardon? Didn't Adventist Health Care, didn't our opinion in Adventist Health Care sort of give a certain gloss to that statement that you just? No. Well, Portland Adventist comes first, and what it does is it lays out the distinction of groups that could be eligible under a State plan versus the only way a group could be eligible was by a Section 115 waiver. I think it's also important to realize that these were not just heightened copayments. They were mandatory, which meant if you didn't pay it, you could be denied the service. And that's what's critical to these copayments. And that when they initiated the copayments, the persons had already been participants in the program for almost three years. This was not a situation where when the program was started, the copayments started then. The copayments were added afterwards. And this is very similar to the case in Veno, because in Veno they were only challenging one part of the demonstration waiver. And under the Secretary's argument, once, unless you challenge the whole project, you can't challenge part of it. And that simply is not what Veno said. The other thing about the notices is that Goldberg v. Kelly was very specific as to what the notice requirements are, but also we have in this case where the Medicaid statute requires certain provisions in a notice. They were not waived in this case. And so it's we have three reasons why there should be adequate notice, the Constitution, the Medicaid statute, and their operational protocol. The other thing about the notices is if this Court doesn't resolve the notice issue, then the district court's decision stands, and it says that these obviously inadequate notices are okay. And that's critical. I mean, that would affect all the people in the Ninth Circuit and certainly all the people in Arizona who have been involved in this case. And so we have been saying that they were entitled to a notice that met the legal standards under Rodriguez v. Chen. The other point to be made, and Mr. Johnston alluded to it, is Proposition 204 stands very differently than the medical expense deduction program. And while the State has come up with various options of what it wants to do, it is the position of the plaintiffs in this case that the State cannot reduce, terminate, eliminate Proposition 204 because it is a voter initiative. So it's much different than the medical expense deduction. Who were at the time. Roberts. I was just curious. That's a whole different issue. It is a whole different issue. But I think it's important to realize that they stand, they have a different interest than the medical expense deduction. And I see my time is up. Thank you, Your Honor. Thank you for your arguments. They're very helpful. The case is submitted at this time and will be in recess until tomorrow. Thank you all very much.
judges: O'grady, Goodwin, Paez